**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TYSON FOODS, INC.,

*Plaintiff*,

v.

KEYSTONE FOODS HOLDINGS LIMITED
(n/k/a BEEF HOLDINGS LIMITED) and
MARFRIG GLOBAL FOODS S.A.,

*Defendants*.

No. 1:19-cv-10125 (ALC)(GWG)

**Related Case No.:**
1:19-cv-3888 (ALC)(GWG)

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
PRE-DISCOVERY MOTION BY ORDER TO SHOW CAUSE SEEKING PARTIAL
SUMMARY JUDGMENT ON COUNTS I AND II OF THE COMPLAINT**

---

Michael B. Carlinsky
Blair A. Adams
Evan Hess
Jaclyn Palmerson
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 3

      A.    Tyson Defrauds Marfrig In The Sale Of Keystone ................................................ 3

      B.    Tyson Materially Breaches The SPA ..................................................................... 4

      C.    The Korean Business ............................................................................................ 6

      D.    Tyson Fails To Restore The Korean Business's Sales Volume ............................ 7

      E.    Tyson Improperly Tries To Exercise Its Conditional Right To Sell the Korean Business Back To Beef Holdings ................................................................ 8

      F.    Procedural History ................................................................................................ 9

ARGUMENT ....................................................................................................................... 9

I.     Tyson Has Not Met Its Burden To Establish "Reasonable Best Efforts" ..................... 10

II.    Tyson's Premature Summary-Judgment Motion Should Be Denied Because Defendants Lack Essential Facts To Support Their Opposition ................................... 14

III.   Tyson's Summary-Judgment Motion Should Be Denied Because Tyson Failed To Comply With Material Terms Of The SPA ............................................................. 18

      A.    Tyson Has Not Satisfied The Prerequisites To Exercise Its Conditional Right To Sell The Korean Business Back To Beef Holdings ................................ 18

      B.    Defendants' Material-Breach Defense Prevents Summary Judgment ................. 19

            1.    The Parties' Single Contract Is Not Two Separate Contracts ................... 20

            2.    Tyson Has Not Identified Any Continued Performance By Defendants That Would Prevent Defendants From Excusing Performance As To The Korean Business ................................................ 24

CONCLUSION .................................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*Arp Films, Inc. v. Marvel Entm't Grp., Inc.*,
  952 F.2d 643 (2d Cir. 1991) ........................................................................... 19

*Ass'n of Car Wash Owners Inc. v. City of New York*,
  911 F.3d 74 (2d Cir. 2018) ............................................................................. 14

*Bear, Stearns Funding, Inc. v. Interface Grp.–Nev., Inc.*,
  361 F. Supp. 2d 283 (S.D.N.Y. 2005) ..................................................... 19 n.13

*Bigda v. Fischbach Corp.*,
  898 F. Supp. 1004 (S.D.N.Y. 1995) ............................................................... 24

*Bloor v. Falstaff Brewing Corp.*,
  454 F. Supp. 258 (S.D.N.Y 1978), *aff'd*, 601 F.2d 609 (2d Cir. 1979) .................. 10

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ....................................................................................... 14

*Commerce Funding Corp. v. Comprehensive Habilitation Servs.*,
  2005 WL 447377 (S.D.N.Y. Feb. 24, 2005) ..................................................... 19

*Delphi-Delco Elecs. Sys. v. M/V Nedlloyd Europa*,
  324 F. Supp. 2d 403 (S.D.N.Y. 2004) ............................................................. 14

*Dogwood Assocs., L.P. v. Douglas Elliman-Gibbons & Ives, Inc.*,
  1993 WL 361655 (S.D.N.Y. Sept. 14, 1993) ............................................ 11 n.7

*Dufort v. City of New York*,
  874 F.3d 338 (2d Cir. 2017) ...................................................................... 9–10

*Excelled Sheepskin & Leather Coat Corp. v. Ore. Brewing Co.*,
  897 F.3d 413 (2d Cir. 2018) ........................................................................... 10

*First Sav. & Loan Ass'n of Jersey City v. Am. Home Assurance Co.*,
  29 N.Y.2d 297 (1971) ..................................................................................... 20

*Ginett v. Computer Task Grp., Inc.*,
  962 F.2d 1085 (2d Cir. 1992) ......................................................................... 20

*Hellstrom v. U.S. Dep't of Veterans Affairs*,
  201 F.3d 94 (2d Cir. 2000) ......................................................................... 1, 14

*Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*,
  2013 WL 1191895 (S.D.N.Y. Mar. 22, 2013) ................................................. 11

*Holland Am. Cruises, N.V. v. Carver Fed. Sav. & Loan Ass'n*,
  60 A.D.2d 545 (1st Dep't 1977) ................................................................. 11–12

*Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*,
  891 F.2d 414 (2d Cir. 1989) ............................................................................ 14

*Impax Labs., Inc. v. Turing Pharms. AG*,
  2017 WL 4357893 (S.D.N.Y. Sept. 29, 2017) .................................................. 11

*In re Johns-Manville Corp.*,
  759 F.3d 206 (2d Cir. 2014) ............................................................................ 18

*Lanmark Grp., Inc. v. N.Y.C. Sch. Const. Auth.*,
  148 A.D.3d 603 (1st Dep't 2017) .................................................................... 21

*Learonal, Inc. v. ACL Elecs. (USA) Inc.*,
  1997 WL 458767 (S.D.N.Y. Aug. 11, 1997) .................................................... 23

*Lenzi v. Systemax, Inc.*,
  944 F.3d 97 (2d Cir. 2019) .............................................................................. 11

*Lucente v. IBM*,
  310 F.3d 243 (2d Cir. 2002) ............................................................................ 24

*Negrete v. Citibank, N.A.*,
  2016 WL 67788 (S.D.N.Y. Jan. 5, 2016) .................................................. 17 n.11

*Polyglycoat Corp. v. C.P.C. Distribs., Inc.*,
  534 F. Supp. 200 (S.D.N.Y. 1982) ............................................................ 11 n.7

*Process Am., Inc. v. Cynergy Holdings, LLC*,
  839 F.3d 125 (2d Cir. 2016) ............................................................................ 19

*RJ Capital, S.A. v. Lexington Capital Funding III, Ltd.*,
  2013 WL 1294515 (S.D.N.Y. Mar. 30, 2013) .............................................. 7 n.5

*Robin Bay Assocs., LLC v. Merrill Lynch & Co.*,
  2008 WL 2275902 (S.D.N.Y. June 3, 2008) .............................................. 10, 15

*Samba Enterps., LLC v. iMesh, Inc.*,
  2009 WL 705537 (S.D.N.Y. Mar. 19, 2009) ............................................. 22, 23

*Scull v. Hennegan*,
  2017 WL 2374496 (W.D.N.Y. May 4, 2017) .................................................. 14

*Shree Shiv Shakti Corp. v. Khalid Props., LLC*,
  106 A.D.3d 1434 (3d Dep't 2013) .............................................................. 11 n.7

*Soroof Trading Dev. Co. v. GE Microgen Inc.*,
    2013 WL 5827698 (S.D.N.Y Oct. 30, 2013) ............................................................ 11

*Transcare N.Y., Inc. v. Finkelstein, Levine & Gittlesohn & Partners*,
    23 A.D.3d 250 (1st Dep't 2005) ..................................................................... 11 n.7

*V.W. ex rel. Williams v. Conway*,
    236 F. Supp. 3d 554 (N.D.N.Y. 2017) ................................................................. 12

*VSF Fin., Inc. v. Falcon Fifty LLC*,
    17 F. Supp. 3d 372 (S.D.N.Y. 2014) ............................................................. 19 n.13

*Vt. Teddy Bear Co. v. 1-800 Beargram Co.*,
    373 F.3d 241 (2d Cir. 2004) ............................................................................. 10

*Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.*,
    247 F. Supp. 2d 352 (S.D.N.Y. 2002) ............................................................ 17 n.11

*Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*,
    2015 WL 5671724 (S.D.N.Y. Sept. 22, 2015) .................................................... 7 n.5

## **Rules**

Fed. R. Civ. P. 56(d) ................................................................................... 2, 14

iv

Defendants Keystone Foods Holdings Limited (n/k/a Beef Holdings Limited) ("Beef Holdings") and Marfrig Global Foods S.A. ("Marfrig") respectfully submit this memorandum of law in opposition to Plaintiff Tyson Foods, Inc.'s ("Tyson") pre-discovery summary-judgment motion as to Counts I and II of Tyson's Complaint. Count I asserts a declaratory-judgment claim and Count II asserts a specific-performance claim related to Defendants' alleged breach of Section 5.12 of the August 17, 2018 Share Purchase Agreement ("SPA"), whereby Tyson acquired Marfrig's U.S. and Asia Pacific poultry and fish business, called Keystone Foods ("Keystone").

## PRELIMINARY STATEMENT

"Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000). This is not one of those rare cases.

Before discovery has even begun in this action, Tyson asks this Court to resolve a classic factual dispute based solely on two self-serving and conclusory affidavits submitted by its own employees. Based on these untested affidavits, Tyson asserts that there is no material dispute of fact that it used "reasonable best efforts" to restore the sales volume of Keystone's operations in Korea (the "Korean Business") on "reasonable commercially viable terms." New York courts repeatedly recognize that the best-efforts analysis is a fact question that "necessarily takes its meaning from the circumstances" and that "questions of commercial reasonableness are necessarily fact intensive." These highly contextual fact questions cannot properly be decided on summary judgment—let alone pre-discovery summary judgment.

Tyson fails to submit any evidence addressing the key facts and circumstances that will drive the Court's best-efforts and commercial-reasonableness analysis. These include the terms Tyson offered to obtain business, the counteroffers Tyson received, the reasonable concessions Tyson made, whether Tyson proposed reasonable pricing protocols, whether Tyson considered

1

reasonable adjustments to its production facility, how many potential new customers Tyson contacted, the number and seniority of people Tyson dedicated to the effort, the frequency or scope of its outreach efforts, and whether Tyson solicited leads or hired outside help to generate business. Without this information, Tyson cannot establish that it has used reasonable best efforts or sought commercially reasonable terms.

Federal Rule of Civil Procedure 56(d) is meant to protect against precisely this type of premature summary judgment motion, where, at a minimum, discovery is needed to properly address core factual disputes.  The serious factual questions not yet answered here as to Tyson's efforts must be addressed through discovery.  In discovery, Defendants will seek information from Tyson about its attempts to restore business with the Korean Business's former largest customer, ███████████████████████████████████████████████████████████  Defendants will also seek information about Tyson's attempts to identify and solicit new business from other existing clients of the Korean Business and Tyson and from other potential clients.  Defendants will also seek information about Tyson's marketing, advertising, and promotion of the Korean Business.  All of this information is exclusively in Tyson's control. Defendants will also seek information from third parties that discussed potential sales contracts with Tyson related to the Korean Business, to evaluate why those efforts were unsuccessful. Without this information, determinations as to whether Tyson's efforts and the terms discussed with potential customers were reasonable cannot be made.

Tyson's motion for summary judgment should also be denied because of Tyson's failure to comply with relevant contractual terms.  *First*, Tyson has not met the procedural requirements to trigger Beef Holdings' obligation to repurchase.  The SPA expressly requires that Tyson deliver to Beef Holdings a writing setting out various adjustments to the $60-million purchase price.

Tyson has never delivered the required writing.  *Second*, any obligation that Beef Holdings had to repurchase the Korean Business is excused by Tyson's prior material breaches of the SPA, which are the subject of an earlier filed lawsuit pending before this Court.  At a minimum, those claims of breach raise issues of fact precluding summary judgment here.

For all these reasons, Tyson's pre-discovery summary-judgment motion should be denied.

## STATEMENT OF FACTS[1]

### A.    Tyson Defrauds Marfrig In The Sale Of Keystone

In 2018, as part of a plan to deleverage, Marfrig conducted a competitive, two-step auction to sell Keystone.  As alleged in the complaint filed by Defendant Beef Holdings in the First-Filed Action,[2] during the auction's second phase, two frontrunners emerged: Tyson and another bidder (the "Other Bidder").  First-Filed Action Compl. ¶¶ 26–27.  Concerned that the Other Bidder— one of Tyson's chief competitors—might use Keystone to break into the U.S. poultry market, Tyson promised to acquire Keystone for a net price of $2.5 billion, "***with no further deductions***," so long as other deal terms could be finalized through good-faith negotiations.  *Id.* ¶ 29.  In exchange, Marfrig agreed to cut off negotiations with the Other Bidder.  *Id.* ¶¶ 28–29.  Unbeknownst to Marfrig, Tyson never intended to honor its price commitment.  *Id.* ¶¶ 35–36.  Instead, on the eve of signing a final agreement, Tyson abruptly demanded a $330 million reduction in the agreed-upon Purchase Price—moving the price below the Other Bidder's previous bid.  *Id.* ¶ 36.  Though Marfrig was stunned and outraged, because Marfrig had ended negotiations with the Other Bidder, its only alternative would have been to restart the auction process, which

---

[1]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the SPA (Baker Decl. Ex. D).

[2]    The "First-Filed Action" refers to the case currently pending before this Court captioned *Keystone Foods Holding Ltd. v. Tyson Foods, Inc.*, Case No. 19-cv-3888 (ALC) (S.D.N.Y.).

meant spending millions more to sell Keystone and de-railing Marfrig's year-end deleveraging target. *Id.* ¶ 38.  Faced with that Hobson's choice, Marfrig signed the SPA on August 17, 2018. *Id.* ¶ 39; CSMF ¶ 5.[3]

**B.      Tyson Materially Breaches The SPA**

Tyson's underhanded conduct continued after the parties executed the SPA through its manipulation of a process known as Purchase-Price adjustment, which is a normally routine process to true-up differences in cash, working capital, and indebtedness between the latest agreed-upon financial statements and the Closing.

The Purchase-Price-adjustment process proceeds in four steps.  *First*, prior to Closing, Beef Holdings provides Tyson with an Estimated Statement that calculates the Purchase Price.  Baker Decl. Ex. D (SPA) § 2.3.3.  If Tyson objects to the Estimated Statement, it must provide "a detailed written statement of its objections."  *Id.  Second*, after Closing, Tyson delivers a Closing Statement with its calculation of the Purchase Price.  *Id.* § 2.4.1.  *Third*, Beef Holdings responds to Tyson's Closing Statement with an Objection Notice specifying "those items or amounts as to which [Beef Holdings] disagrees."  *Id.* § 2.4.2.  The parties then negotiate to see if they can reach agreement as to the disputed amounts.  *Id.* § 2.4.3.  *Fourth*, if the parties cannot reach agreement, the disputes properly arising from Purchase-Price adjustments are submitted to an Accounting Firm to calculate the Purchase Price.  *Id.*

Prior to Closing, Beef Holdings provided its Estimated Statement to Tyson, listing the Estimated Purchase Price as $1,382,323,205.  First-Filed Action Compl. ¶ 67.  Tyson failed to object to the Estimated Purchase Price prior to Closing, *id.*, as required by the SPA.  Baker Decl.

---

[3]      Citations to "CSMF ¶ _" are to the Counterstatement of Material Facts in Opposition to Plaintiff Tyson Foods, Inc.'s Pre-Discovery Motion by Order to Show Cause Seeking Partial Summary Judgment on Counts I and II of the Complaint, filed herewith.

Ex. D (SPA) § 2.3.3.   After Closing, Tyson submitted its Closing Statement, listing a massive $232 million reduction to the Estimated Purchase Price.   First-Filed Action Compl. ¶ 68; Adams Decl. Ex. 1 (Beef Holdings' Objection Notice).   The reduction is largely driven by eight disputed adjustments (the "Disputed Adjustments"), accounting for $173.7 million in price reduction.   *Id.* ¶ 68.   Tyson's calculation of the Disputed Adjustments materially breached the SPA in two ways.

*First*, as to certain Disputed Adjustments, Beef Holdings alleges that Tyson failed to comply with the "Accounting Principles."   *See, e.g.*, *id.* ¶¶ 124–32.   The SPA defines the required Accounting Principles as the International Financial Reporting Standards ("IFRS") as of August 17, 2018, and, to the extent not inconsistent with IFRS, the accounting methods, practices, procedures, and policies consistently applied to prepare the audited consolidated financial statements of [Keystone] for the period ended December 30, 2017.   Baker Decl. Ex. D (SPA) § 1.1, at 1.   In other words, unless they are inconsistent with IFRS, Keystone's consistently applied accounting methods used in its audited 2017 year-end financials are dispositive.   Tyson repeatedly ignored Keystone's consistently applied accounting methods, despite having no legitimate claim that Keystone's methods violated IFRS.   For example, as one Disputed Adjustment, Tyson asserts that $116.6 million in equipment leases that Keystone has consistently categorized one way under IFRS for years must now all be reclassified in a manner that reduces the Purchase Price, despite the fact that Tyson was well aware of Keystone's historical accounting treatment of the leases and had never raised any issue with it during extensive due diligence.   *See* First-Filed Action Compl. ¶ 82.

*Second*, certain Purchase-Price-adjustment categories are defined by reference to a historical calculation performed as of June 30, 2018, which is provided in SPA Schedule 1.1. Baker Decl. Ex. D (SPA) § 1.1, at 2, 7–8, 11.   In the Disputed Adjustments, Tyson repeatedly

failed to comply with the historical calculation in SPA Schedule 1.1. *See* First-Filed Action Compl. ¶¶ 133–68.[4]  For example, as one Disputed Adjustment, Tyson contends that Keystone should have taken $4.9 million in reserves for potential long-term environmental liabilities at three facilities where Keystone has historically never taken these reserves and took no such reserve on SPA Schedule 1.1. *Id.* ¶ 95.

Beef Holdings filed a lawsuit seeking to address these breaches (among other claims) on April 15, 2019, captioned *Keystone Foods Holdings Ltd.* (*n/k/a Beef Holdings Ltd.*) *v. Tyson Foods, Inc.*, in the Supreme Court for the State of New York (defined above as the "First-Filed Action").  The First-Filed Action is now before this Court.  *See Keystone Foods Holding Ltd. v. Tyson Foods, Inc.*, No. 19-cv-3888 (ALC)(GWG) (S.D.N.Y.).

## C.  The Korean Business

As part of its acquisition of the Keystone business, Tyson acquired a poultry-processing plant located in South Korea (defined above as the "Korean Business").  In the years prior to the Keystone sale, approximately 90 percent of the Korean Business's sales were to one customer ("Customer").  CSMF ¶ 10.  In 2017, however, the Korean Business became embroiled in a food-contamination issue that caused Customer to suspend its poultry purchases from the Korean Business. *Id.* ¶ 18.

Miron Decl. ¶¶ 5–8; CSMF ¶ 38.  Tyson was fully aware of the food-

---

[4]  Tyson has moved to compel arbitration of certain of Beef Holdings' claims and moved to dismiss other claims.  *See* First-Filed Action (No. 19-cv-3888) ECF Nos. 47–49-9, 55–56-1, 60. Beef Holdings has also sought to amend its complaint as of right, *see* First-Filed Action ECF Nos. 50–54, but Tyson objected to Beef Holdings amendment as of right as inconsistent with the Court's individual practices. *Id.*

contamination issue and the suspension of Customer's purchases from the Korean Business when it agreed to purchase the Korean Business as part of the Keystone transaction. *See* CSMF ¶ 41.

In SPA Section 5.12, the parties agreed that Tyson would have a conditional right to sell the Korean Business back to Beef Holdings. Four conditions must occur before Tyson acquires the right to sell back: (1) seven months must elapse from the Closing Date; (2) Tyson must "conduct the business and operations of the Korean Business in good faith"; (3) Tyson must "use its reasonable best efforts to cause the Korean Business to achieve sales volume of 16,000 metric tons per annum on reasonable commercially viable terms"; and (4) Tyson must fail to achieve the 16,000-metric-ton sales volume. Baker Decl. Ex. D (SPA) § 5.12. Upon the occurrence of all four conditions, Tyson obtains the right to sell the Korean Business back to Beef Holdings for $60 million "subject to the same terms and conditions set forth in this Agreement (including … price adjustment for Indebtedness, Quasi-Indebtedness, Cash and Working Capital …)." *Id.*

### D.   Tyson Fails To Restore The Korean Business's Sales Volume

During the seven months following the Closing, Tyson failed to agree to new contracts with Customer or to replace Customer's business with other clients. CSMF ¶ 30. Even worse, Tyson claims to have achieved only 7 percent of the 16,000-metric-ton sales target, an abysmally low sales number that alone raises questions of Tyson's good faith.[5] Baker Decl. ¶ 23. Defendants

---

[5] One of the conditions to Tyson's right to sell the Korean Business back to Beef Holdings requires Tyson to "conduct the business and operations of the Korean Business in good faith." Baker Decl. Ex. D (SPA) § 5.12. Whether Tyson complied with this condition also raises a factual question. *See Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*, 2015 WL 5671724, at *18 (S.D.N.Y. Sept. 22, 2015) ("[W]hether the duty of good faith was breached is ordinarily a question of fact to be determined by the jury or other finder of fact." (quotation omitted)); *RJ Capital, S.A. v. Lexington Capital Funding III, Ltd.*, 2013 WL 1294515, at *13 (S.D.N.Y. Mar. 30, 2013) ("[W]hether a party to a contract has acted in good faith generally presents a question of fact for a jury."). As alleged in the First-Filed Action (First-Filed Action Compl. ¶ 29), the Korean Business was originally excluded from the Keystone sale. It was added to the sale contemporaneous with Tyson's attempt to close out Other Bidder (one of Tyson's chief competitors), with whom Defendants were also negotiating the sale of the Korean Business. *Id.* ¶¶ 27–29. Tyson's

have not yet had the opportunity to engage in discovery on what Tyson did and did not do in the period since it acquired the Korean Business and why Tyson was not able to restore the Korean Business's relationship with Customer ████████████████████████████████████████ ████████  As a result, Defendants do not know what efforts Tyson made to reengage Customer or to acquire replacement business.  CSMF ¶ 47.  Before Tyson filed suit, Defendants requested that Tyson provide information sufficient to demonstrate its efforts.  *Id.* ¶ 46.  Though Tyson provided some documents regarding the Korean Business's sales volume, it flatly refused to provide any information to explain why negotiations with Customer failed.  *Id.* ¶ 47. Compounding this information inequality, Tyson also apparently ███████████████████████ ████████████████████████████████████████████████████ *Id.* ¶ 51.

The documents that Tyson provided also showed that, though Tyson engaged with other customers, for reasons currently unknown to Defendants, Tyson and these replacement customers failed to agree to new sales contracts.  *Id.* ¶ 50.  This too raises significant factual questions for which discovery must be taken.

### E.     Tyson Improperly Tries To Exercise Its Conditional Right To Sell the Korean Business Back To Beef Holdings

The seven-month period post-Closing elapsed on June 30, 2019.  CSMF ¶ 28.  On July 1, 2019, Tyson purported to exercise its conditional right to sell the Korean Business back to Beef Holdings.  *Id.* ¶ 32.  Tyson's exercise notice did not provide any evidence to support Tyson's satisfaction of the conditions precedent to its right to sell the Korean Business back or provide any

---

subsequent inability to achieve anything more than 7 percent of sales volume raises a question of whether Tyson acted in good faith or whether, after successfully keeping Other Bidder from acquiring the Korean Business, Tyson was content with simply forcing Beef Holdings to repurchase the Korean Business.

documentation of the Korean Business's failure to meet sales targets during the seven-month period.  *Id.* ¶ 45.  In response to the exercise notice, Beef Holdings requested certain information "[t]o evaluate … whether Tyson has conducted the business in good faith and used its reasonable best efforts."  *Id.* ¶ 46.  Tyson refused to provide any information without an onerous non-disclosure agreement.  *Id.* ¶ 50.  Eventually, the parties agreed to a confidentiality agreement that tracked the SPA's confidentiality provisions, and Tyson produced information showing the Korean Business's sales volume.  *Id.*  Tyson did not provide any information regarding its unsuccessful efforts to negotiate a new supply contract with Customer.  CSMF ¶ 47.

### F.    Procedural History

Despite purporting to exercise its conditional right to sell the Korean Business back on July 1, 2019, Tyson did not file this action until October 31, 2019, nearly four months later.  Less than three weeks after filing, however, Tyson moved by order to show cause[6] for summary judgment as to Count I of its Complaint, which seeks a declaratory judgment that Beef Holdings must repurchase the Korean Business, and Count II, which brings a cause of action for "specific performance" of Beef Holdings and Marfrig's obligations under the SPA related to the Korean Business.  At this time, no fact discovery has occurred in this case, and initial document requests are not scheduled until February 15, 2020.  ECF No. 42 ¶ 10(a).

### ARGUMENT

Summary judgment is appropriate only "if the pleadings, the discovery and the disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact

---

[6]    By electing to bring its summary-judgment motion by order to show cause, Tyson circumvented this Court's individual practice requiring a pre-motion letter and pre-motion conference.  Individual Practices § 2.A.  This maneuver thus foreclosed Defendants' opportunity to raise to the Court earlier that Tyson's pre-discovery summary-judgment motion was improper.

and the movant is entitled to judgment as a matter of law.'" *Dufort v. City of New York*, 874 F.3d 338, 347 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).  On a motion for summary judgment, the court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  As the movant, Tyson "bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'" *Excelled Sheepskin & Leather Coat Corp. v. Ore. Brewing Co.*, 897 F.3d 413, 419 (2d Cir. 2018).

## I.   TYSON HAS NOT MET ITS BURDEN TO ESTABLISH "REASONABLE BEST EFFORTS"

The SPA expressly conditions Tyson's right to sell the Korean Business back to Beef Holdings on Tyson's use of "its reasonable best efforts to cause the Korean Business to achieve sales volume of 16,000 metric tons per annum on reasonable commercially viable terms."  Baker Decl. Ex. D (SPA) § 5.12.  Tyson is not entitled to summary judgment because it cannot show that it used "reasonable best efforts" in restoring the Korean Business's sales volume "on reasonable commercially viable terms."

A "best efforts" provision imposes "an obligation to act in good faith in light of one's capabilities" and "to pursue ***all*** reasonable methods."  *Robin Bay Assocs., LLC v. Merrill Lynch & Co.*, 2008 WL 2275902, at *7 (S.D.N.Y. June 3, 2008) (emphasis added) (quotations omitted).  The term "best efforts" "necessarily takes its meaning from the circumstances."  *Bloor v. Falstaff Brewing Corp.*, 454 F. Supp. 258, 266 (S.D.N.Y 1978), *aff'd* 601 F.2d 609 (2d Cir. 1979).  Thus, the best-efforts analysis "will almost invariably … involve a question of fact."  *Robin Bay*, 2008 WL 2275902, at *7 (quoting *Kroboth v. Brent*, 215 A.D.2d 813, 814 (3d Dep't 1995)).  Fact questions like whether a party has used best efforts are not appropriately resolved on summary judgment—let alone pre-discovery summary judgment—because, on summary judgment, courts

do not "weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (quotation omitted).

Applying these principles, New York courts have repeatedly denied summary-judgment motions that require a determination of whether a party has used "best efforts," even where that motion is made on a full evidentiary record after discovery is completed. *See, e.g.*, *Impax Labs., Inc. v Turing Pharms. AG*, 2017 WL 4357893, at *18 (S.D.N.Y. Sept. 29, 2017) (denying summary judgment on claim for declaratory judgment because "whether [party] used 'best efforts'" was a "question[] of fact"); *Soroof Trading Dev. Co. v. GE Microgen Inc.*, 2013 WL 5827698, at *5 (S.D.N.Y Oct. 30, 2013) (denying summary judgment on breach-of-contract claim because "[w]hether Defendants acted with good faith in light of their capabilities to supply their Product involves questions of fact").[7]

Moreover, the contracts that restore the Korean Business's sales volume are to be made on "reasonable commercially viable terms." Baker Decl. Ex. D (SPA) § 5.12. Like the best-efforts analysis, "questions of commercial reasonableness are necessarily fact intensive." *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, 2013 WL 1191895, at *11 (S.D.N.Y. Mar. 22, 2013); *see also Holland Am. Cruises, N.V. v. Carver Fed. Sav. & Loan Ass'n*, 60 A.D.2d 545, 545

---

[7]       *See also Dogwood Assocs., L.P. v. Douglas Elliman-Gibbons & Ives, Inc.*, 1993 WL 361655, at *4 (S.D.N.Y. Sept. 14, 1993) (denying summary judgment because "[w]hether or not [defendant] used its 'best efforts … presents a triable issue of fact"); *Polyglycoat Corp. v. C.P.C. Distribs., Inc.*, 534 F. Supp. 200, 203 (S.D.N.Y. 1982) (denying summary judgment on anticipatory-breach claim because of "material issues of fact" regarding violation of "best efforts" provision of the agreement); *Shree Shiv Shakti Corp. v. Khalid Props., LLC*, 106 A.D.3d 1434, 1437 (3d Dep't 2013) (affirming denial of summary judgment because "there are factual issues posed" as to defendant's use of best efforts); *Transcare N.Y., Inc. v. Finkelstein, Levine & Gittlesohn & Partners*, 23 A.D.3d 250, 251 (1st Dep't 2005) (affirming denial of summary judgment, despite defendant's "insistence that it made several good faith attempts" in satisfaction of its best-efforts obligation, because "[s]ignificant questions of facts exist as to the adequacy of the efforts").

(1st Dep't 1977) ("The question whether defendant … acted in accordance with the reasonable commercial standards applicable to the business… presents a question of fact which precludes summary judgment" (quotations omitted)).

These two highly contextual fact questions cannot properly be decided on a summary-judgment motion, let alone pre-discovery summary judgment.   Tyson cannot overcome the contextual nature of these fact questions by submitting two self-serving and conclusory witness affidavits.   As a preliminary matter—discussed more fully below (*see* Part II)—these witness statements are completely untested in discovery.   Defendants have not had an opportunity to cross-examine the declarants, let alone test their statements with reference to contemporaneous documents.   *See V.W. ex rel. Williams v. Conway*, 236 F. Supp. 3d 554, 580 (N.D.N.Y. 2017) (denying summary judgment where nonmovants "have not yet been given an opportunity to test the veracity of the 'undisputed' facts set forth in the[] declarations—among other things, they have not yet had an opportunity to depose any of these individuals.   That is not how the truth-testing feature of our adversary system of litigation is generally though to work best").

In any event, even accepting these factual affidavits as accurate, they do not resolve the fact questions of what qualifies as "reasonable best efforts" or "reasonable commercially viable terms" under the circumstances of this case.   Tyson relies on these affidavits to identify only three activities that purportedly show its "reasonable best efforts":  (1) communications and meetings with Customer's U.S. management and Global Supply Chain executives; (2) meetings with Customer's local Korean leadership; and (3) renaming of the Korean Business.   Mem. 6 (citing S.D.N.Y. Local Civ. R. 56.1 Stmt. ¶ 29).[8]   These facts fall well short of showing reasonable best

---

[8]      Paragraph 29 of Tyson's Local Rule 56.1 Statement, in turn, relies on the declaration of Brian Baker, Tyson's Vice President, Business Optimization, International.   S.D.N.Y. Local Civ. R. 56.1 Stmt. ¶ 29 (citing Baker Decl. ¶ 21).   Inconsistent with Rule 56, the Baker declaration

efforts.  For example, Tyson fails to provide any context for its negotiations with Customer or

other existing customers.  To properly assess Tyson's efforts, various factors must be considered,

like the terms Tyson offered, the counteroffers Tyson received, the reasonable concessions Tyson

made, whether Tyson proposed reasonable pricing protocols, and whether Tyson considered

reasonable adjustments to its production facility.  Absent information contextualizing Tyson's

efforts and the terms discussed with Customer, determining whether Tyson used "reasonable best

efforts" or pursued "reasonable commercially viable terms" is not possible.[9]

Thus, Tyson has not met its burden of proof to establish, beyond factual dispute, that it

engaged in reasonable best efforts to restore the Korean Business's sales volume on reasonable

commercially viable terms.

---

refers to, but does not place into the record, various "business records."  Baker Decl. ¶ 3.  Without
placing the referenced documents into the record, this declaration is defective.  *See* Fed. R. Civ. P.
56(c)(1)(A) (requiring a party to "cit[e] to particular parts of materials in the record"); *id.* advisory
committee's note (2010) (noting the requirement that "[m]aterials that are not yet in the record—
including materials referred to in an affidavit or declaration—must be placed in the record").

[9]     Tyson also includes in the Declaration of Tan Sun conclusory factual statements regarding
Tyson's supposed efforts to obtain supply contracts with entities other than Customer.  The
purported efforts to obtain new customers are never mentioned or referenced in either Tyson's
brief or its Local Civil Rule 56.1 statement.  Even if the Court were to consider these efforts, they
are no substitute for Tyson's failure to establish that it engaged in "***all*** reasonable efforts" with
Customer, who was, after all, the most likely generator of sales volume for the Korean Business.
Moreover, like the "evidence" submitted with regard to Customer, the Sun Declaration offers no
detail about the terms, offers, concessions, pricing protocols, or facility adjustments that Tyson
made to attract replacement business.  Even more fundamentally, the Sun Declaration offers no
detail about the number of other customers that Tyson contacted, the frequency or scope of their
outreach efforts, and whether Tyson sought outside assistance or other leads.  And, like the Baker
Declaration, *see supra* note 8, the Sun Declaration is procedurally defective because it refers to
and relies on "corporate records" that are not "placed in the record."  Fed. R. Civ. P. 56 advisory
committee's note (2010); Sun Decl. ¶ 24.

## II. TYSON'S PREMATURE SUMMARY-JUDGMENT MOTION SHOULD BE DENIED BECAUSE DEFENDANTS LACK ESSENTIAL FACTS TO SUPPORT THEIR OPPOSITION

"Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000). Pre-discovery summary judgment is so rare because summary judgment is a "drastic device" that should be denied "when there are major factual contentions in dispute." *Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 83 (2d Cir. 2018) (quotation omitted). That is "particularly so when, as here, one party has yet to exercise its opportunities for pretrial discovery." *Id.*

Rule 56(d) protects nonmovants denied discovery from being "railroaded" by their opponent with a premature summary-judgment motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Rule 56(d) permits a court to defer considering or to deny the motion, to allow time for discovery, or to issue any other appropriate order if the nonmovant submits a declaration showing, "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). A Rule 56(d) affidavit should state "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 422 (2d Cir. 1989). Because Rule 56(d) "is an important safeguard against improvident or premature motions for summary judgment, courts generally … apply it with a spirit of liberality." *Delphi-Delco Elecs. Sys. v. M/V Nedlloyd Europa*, 324 F. Supp. 2d 403, 417–18 (S.D.N.Y. 2004). "That is especially so here, where the necessary discovery is not in [nonmovants'] possession …." *Scull v. Hennegan*, 2017 WL 2374496, at *5 (W.D.N.Y. May 4, 2017). Defendants' Rule 56(d) affidavit meets all the requirements to deny summary judgment here.

14

***Facts Sought And Methods For Obtaining Them***.   Tyson's summary-judgment motion hinges entirely on two core disputed fact issues: (1) what constitutes "reasonable best efforts" and "reasonable commercially viable terms" under the circumstances of this case; and (2) whether Tyson used its reasonable best efforts to reach certain sales thresholds for the Korean Business on reasonable commercially viable terms.   These inquiries "will almost invariably … involve a question of fact," *Robin Bay Assocs., LLC*, 2008 WL 2275902, at \*7, and this case is no exception.

Here, Defendants lack critical facts they need to properly defend against Tyson's "reasonable best efforts" argument, including information about Tyson's efforts with Customer, other existing customers of the Korean Business and of Tyson, and potential new customers. Specifically, Defendants will seek in discovery at least the following categories of information:

- Tyson's documents and communications exchanged with Customer;

- Tyson's internal documents, communications, analyses, and projections related to Customer's business and consideration of accommodations that the Korean Business could make for Customer;

- Tyson's documents and communications exchanged with other existing clients of the Korean Business and Tyson and other potential clients to replace Customer's business;

- Tyson's internal documents, communications, analyses, and projections related to other existing clients of the Korean Business and Tyson and other potential clients and consideration of accommodations that the Korean Business could make for those clients and potential clients;

- Tyson's analysis and internal assessment of what terms would constitute reasonable commercially viable terms;

- Tyson's marketing and promotion of the Korean Business;

- Tyson's advertising for the Korean Business and any market research performed related to the Korean Business; and

- Whether Tyson considered employing outside marketing, advertising, or research firms to assist its attempt to restore the Korean Business's sales volume.

Because each category of information is in Tyson's exclusive control and Tyson moved for summary judgment before discovery began, Defendants expect to obtain this information in normal-course party discovery as the litigation proceeds.[10]

> ***The Facts Sought Are Reasonably Expected to Create a Genuine Issue of Material Fact.***

Although Defendants lack the necessary discovery now to properly defend against Tyson's conclusory "reasonable best efforts" claim, the facts currently known by Defendants suggest that Tyson did not engage in "reasonable best efforts" to restore the Korean Business's sales volume on "reasonable commercially viable terms" or, at least, raise serious questions about its effort.

For example, prior to the sale of the Korean Business to Tyson, Customer ███████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ Miron Decl. ¶¶ 5–8; CSMF ¶¶ 37–42.  Yet, despite a clear roadmap to restoring sales volume, Tyson somehow failed to obtain ***any*** contract with Customer.  CSMF ¶ 30; Baker Decl. ¶ 22.  And Tyson's apparent insistence that ██████████████████████████████████████████ ███████████████████████████████████  CSMF ¶ 52.  Likewise, Tyson's failure to secure any new contracts with other existing customers or new customers over seven months raises similar questions as to Tyson's "reasonable best efforts" and whether Tyson sought "reasonable commercially viable terms."

---

[10]     Defendants believe that discovery may show that Tyson's true motivation in acquiring the Korean Business was to keep it out of the hands of Other Bidder.  Thus, the evidence may show that Tyson was not truly motivated to operate the business to achieve the target sales levels and, instead, that Tyson was content to return the Korean Business to Beef Holdings, so long as Other Bidder did not acquire it.  Evidence like this would raise factual issues about Tyson's supposed "good faith" operation of the Korean Business, as well as its best-efforts obligations.

Tyson's inability to secure any new business despite its standing as a leader in the industry creates the reasonable expectation that discovery into its efforts to restore the Korean Business's sales volume will raise genuine issues of material fact.

***Efforts Made To Obtain These Facts***.   Defendants have had no opportunity to obtain discovery regarding Tyson's purported "best efforts" or to test the accuracy of Tyson's witness affidavits.   Tyson moved for summary judgment less than three weeks after it filed its Complaint, and before Defendants even had the opportunity to file an Answer.   No discovery has been exchanged.   Indeed, initial document requests are not scheduled until February 15, 2020, ECF No. 42 ¶ 10(a), and fact discovery will not be completed until September 30, 2020.   *Id.* ¶ 9(d).

***Defendants Inability To Obtain Necessary Facts***.   Despite having no opportunity to gather facts through formal discovery, Defendants have tried to obtain information through informal pre-litigation processes, which Tyson has denied.   Tyson rebuffed Defendants' pre-litigation requests for information regarding its purported "best efforts" to run the Korean Business, CSMF ¶¶ 47–49, refused to provide any information related to negotiations between Tyson and Customer, *id.* ¶ 47, and apparently ███████████████████████████████████████████ *id.* ¶ 52.[11]

---

[11]   Tyson's authority for granting summary judgment is wholly inapplicable here.   Tyson cites only two cases that granted a pre-discovery summary-judgment motion.  Mem. 10.  In both cases, the nonmovant failed to even file a Rule 56(d) affidavit.  *See Negrete v. Citibank, N.A.*, 2016 WL 67788, at *2 (S.D.N.Y. Jan. 5, 2016) (denying a stay of plaintiff's summary-judgment motion and allowing the motion to be heard together with defendant's motion to dismiss; the partial summary judgment motion was subsequently denied, *see Negrete*, 187 F. Supp. 3d 454, 472 (2016)); *Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.*, 247 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) (permitting summary judgment where the only dispute was what "legal inferences [are] to be drawn from undisputed terms to determine the validity, meaning and scope of the two agreements").  The other cases cited by Tyson (Mem. 9–10) involved a summary-judgment motion filed after discovery had occurred.

III.   **TYSON'S SUMMARY-JUDGMENT MOTION SHOULD BE DENIED BECAUSE TYSON FAILED TO COMPLY WITH MATERIAL TERMS OF THE SPA**

A.   **Tyson Has Not Satisfied The Prerequisites To Exercise Its Conditional Right To Sell The Korean Business Back To Beef Holdings**

Tyson is not entitled to summary judgment because it failed to follow the contractual procedure required to exercise its conditional right to sell the Korean Business back to Beef Holdings.  Defendants' conditional obligation to repurchase the Korean Business "at a price of $60,000,000" under SPA Section 5.12 is expressly "subject to the same terms and conditions set forth in [the SPA] … including … price adjustment for Indebtedness, Quasi-Indebtedness, Cash and Working Capital."   An express condition, like this one, "must be literally performed; substantial performance will not suffice."  *In re Johns-Manville Corp.*, 759 F.3d 206, 214 (2d Cir. 2014) (quoting *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 646 (2009)).

Consequently, prior to closing, the seller of the Korean Business (Tyson) must deliver an Estimated Statement that sets forth the actual dollar amount that must be delivered by the buyer of the Korean Business (Beef Holdings) on the Closing Date (defined as the "Estimated Purchase Price").  Baker Decl. Ex. D (SPA) § 2.3.3 ("Not less than three Business Days following the Conditions Satisfaction Date, Seller ***shall*** prepare and deliver to Buyer … its calculation of the Estimated Purchase Price …" (emphasis added)).  The Estimated Purchase Price will vary from $60 million based on changes in Cash, Working Capital, Indebtedness, and Quasi-Indebtedness prior to closing.  *Id.* § 2.3.1.  And, at closing, Beef Holdings is required to deliver the Estimated Purchase Price, not $60 million.  *Id.* § 2.2.2(ii).

It would be impossible for Beef Holdings to consummate the repurchase of the Korean Business ***before*** Tyson delivers the Estimated Statement, because Beef Holdings would not know what price it was (purportedly) required to pay.  Yet, despite being alerted to the need for an Estimated Statement, Tyson has refused to deliver one.  Thus, absent an Estimated Statement, Beef

Holdings' purported obligation to repurchase the Korean Business is not yet triggered.  Until Tyson delivers the Estimated Statement, its declaratory-judgment and specific-performance claims are premature.

### B.  Defendants' Material-Breach Defense Prevents Summary Judgment

Lastly, Tyson is not entitled to summary judgment because of its prior material breaches of the SPA.  It is axiomatic that, when a party materially breaches a contract, its counterparty's performance under the contract is excused.  *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016).  As alleged in the First-Filed Action, Tyson materially breached the SPA by, among other things, calculating Purchase-Price adjustments that violated Keystone's historical and consistently applied accounting methods and that disregarded the SPA's Disclosure Schedule.  *See supra* Facts Part B.  These breaches are undoubtedly material, as they account for $232 million of the Purchase Price.[12]  Indeed, Tyson does not dispute that its alleged breaches of the SPA, if proven, are material.  Nor could it.  *See, e.g.*, *Arp Films, Inc. v. Marvel Entm't Grp., Inc.*, 952 F.2d 643, 649 (2d Cir. 1991) ("[F]ailure to tender payment is generally deemed a material breach of a contract."); *Commerce Funding Corp. v. Comprehensive Habilitation Servs.*, 2005 WL 447377, at *14 (S.D.N.Y. Feb. 24, 2005) ("Failure to satisfy payment obligations under a contract is 'generally deemed a material breach of contract.'").[13]  Without disproving Defendants' material-breach allegations, Tyson cannot obtain summary judgment.

---

[12]    Even standing alone, each of Tyson's Purchase-Price-adjustment breaches is material.  For instance, Tyson's treatment of leased-equipment adjustment implicates over $115 million of the Purchase Price.

[13]    Moreover, "materiality of a breach is highly fact specific."  *VSF Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 382 (S.D.N.Y. 2014).  "Courts and commentators have long recognized that materiality is primarily a question of fact, the resolution of which is necessarily a function of context and circumstances."  *Bear, Stearns Funding, Inc. v. Interface Grp.–Nev., Inc.*, 361 F. Supp. 2d 283, 295–96 (S.D.N.Y. 2005) (quotation omitted).  At the very least, the materiality of Tyson's breach of the Purchase-Price adjustment provisions is a question of fact.

Tyson tries to avoid this result through two arguments. *First*, Tyson contends that, despite its inclusion in a single unified contract, Tyson's conditional right to sell the Korean Business to Beef Holdings can be cleaved off from the rest of the SPA, rendering it a separate contract. Letter 2, ECF No. 33.[14] *Second*, Tyson contends that Beef Holdings' performance cannot be excused because Beef Holdings purportedly continued to perform under the SPA. *Id.* at 2–3. Both arguments fail.

### 1. The Parties' Single Contract Is Not Two Separate Contracts

Tyson asserts that Beef Holdings' performance is not excused by Tyson's material breaches of the SPA because the "Korean Business put and specific performance provisions" are "separate" and "unrelated" to the Purchase-Price-adjustment provisions. Letter 2. But the general rule under New York law is that a single contract is a single contract, rather than two separate contracts. *See First Sav. & Loan Ass'n of Jersey City v. Am. Home Assurance Co.*, 29 N.Y.2d 297, 299 (1971) ("As a general rule, a contract is entire when by its terms, nature, and purpose, it contemplates and intends that each and all of its parts and the consideration therefor shall be common each to the other and interdependent."). "[T]he primary standard is the intent manifested, viewed in the surrounding circumstances." *Ginett v. Computer Task Grp., Inc.*, 962 F.2d 1085, 1098 (2d Cir. 1992). Thus, courts will not sever a single contract "unless (1) the parties' performance can be apportioned into corresponding pairs of partial performances, and (2) the parts of each pair can be treated as agreed equivalents." *Id.*

Here, the SPA is not divisible because the sale of the overall Keystone business is inextricably intertwined with Tyson's conditional right to sell the Korean Business back to Beef

---

[14]     When Tyson filed its order to show cause, Defendants filed an initial response letter raising certain objections. *See* ECF No. 32. Tyson responded to Defendants' letter, raising new arguments not in its briefing. *See* ECF No. 33. To the extent the Court considers those arguments to be properly raised, Defendants address them in this opposition.

Holdings.  In particular, the SPA had one purpose: the sale of the Keystone business.  *See* Baker Decl. Ex. D (SPA), at 1 ("Seller wishes to sell the Shares to Buyer, and Buyer wishes to purchase the Shares from Seller ….").  And the Keystone business was sold as a whole, not in separate component parts, for a single purchase price (the "<u>Final Purchase Price</u>"), not separate purchase prices for its separate geographic parts.  Compl. ¶ 2; Baker Decl. Ex. D (SPA) § 2.3.  The Keystone business (including the Korean Business) and the conditional right to sell the Korean Business back to Beef Holdings are all incorporated into the Final Purchase Price under the SPA, which is subject to the Disputed Adjustments underlying Defendants' allegations of prior material breaches in the First-Filed Action.  Tyson could not simply subtract $60 million from the Final Purchase Price and refuse to take the Korean Business.  Nor could Tyson decide to abandon the acquisition of Keystone but still purchase just the Korean Business for $60 million.  To the contrary, the right to sell the Korean Business back to Beef Holdings is wholly dependent on, and intertwined with, the initial sale of the Keystone business to Tyson.  Thus, this is not a scenario in which performance can be severed.

Tyson's separate-contracts theory would also lead to absurd results.  *Lanmark Grp., Inc. v. N.Y.C. Sch. Const. Auth.*, 148 A.D.3d 603, 604 (1st Dep't 2017) ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties" (quotation omitted)).  If the SPA were really two separate contracts, Tyson could materially breach the SPA by not delivering any cash in exchange for the Keystone shares.  But because the obligation to tender payment for the entire Keystone business and the conditional right to sell the Korean Business back to Beef Holdings are purportedly severable, Tyson could then require Beef Holdings to repurchase the Korean Business for an additional $60 million, having paid $0 to acquire it in the first place.  Surely, in a transaction with

the singular purpose of exchanging cash for a business, Tyson's obligation to perform its payment obligation (an obligation it materially breached here) cannot be severed from its conditional right to demand payment back for a portion of the business it acquired.

The sole case that Tyson cites in support of its separate-contracts argument is entirely inapposite. The facts of *Samba Enterprises, LLC v. iMesh, Inc.*, 2009 WL 705537 (S.D.N.Y. Mar. 19, 2009), presented an unusual circumstance where the parties entered into two wholly separate agreements that were encompassed in a single document. In the first agreement, the plaintiff contracted to find partners to bundle defendant's software in exchange for a commission. In the second agreement, the plaintiff contracted to negotiate an agreement with a specified counterparty in exchange for a separate commission. *Id.* at *1. These were "two different, independent tasks assigned to [plaintiff]" that did "not depend on" each other and "made no reference to" each other. *Id.* at *6. Each task was subject to separately specific compensation, which was not contingent on completion of the other agreement. *Id.* at *1, 6.

The patchwork agreement in *Samba* bears no resemblance to the contract here, which memorialized the parties' singular purpose: to sell the Keystone business in exchange for the Final Purchase Price. While the "independent tasks" in the *Samba* agreement did "not depend on" each other, the sale of the Keystone business and the conditional option to sell a portion of that business—the Korean Business—back to Beef Holdings in specified circumstances clearly could not exist without each other. Moreover, nearly all of the five factors that the *Samba* court considered to determine that the contract there was divisible support the conclusion here that the SPA is indivisible. *See id.* at *6 (considering (1) "whether the parties entered into one or multiple agreements," (2) "whether the agreement, in referring to itself, uses singular or plural nouns (e.g., 'this Agreement' or 'these Agreements')," (3) whether there is a severability clause, (4) "whether

22

there is an obvious unit-for-unit transaction," and (5) "whether there is a way to determine the consideration for each part of the contract"). The SPA is a single, integrated agreement (Factor 1) that repeatedly refers to itself in the singular form (Factor 2). *See, e.g.*, Baker Decl. Ex. D (SPA), at 1; *id.* §§ 1.4, 3.1, 4.1, 11.13.[15] The SPA does not contain an obvious unit-for-unit transaction with separate consideration (Factors 4 and 5) because it lists a single purchase price—the "Final Purchase Price"—for the Keystone business as a whole, including the Korean Business. As part of the Keystone sale, Tyson was granted a conditional right to sell the Korean Business back to Beef Holdings in specified circumstances—a right that has unspecified and uncertain value (not $60 million) that is not separately carved out in the SPA (and certainly not in an "***obvious*** unit-for-unit transaction"). And while the SPA contains a severability clause (Factor 5), as is standard in this type of agreement, that alone is not enough to overcome the presumption that a single contract is not divisible. As explained in *Learonal, Inc. v. ACL Electronics* (*USA*) *Inc.*, 1997 WL 458767, at *6 (S.D.N.Y. Aug. 11, 1997), "the existence of a severability clause" does not undermine other evidence of an indivisible contract because "[w]hen read with the other provisions of the [agreement], [the severability clause] provides for survival of the [agreement] even if some terms are stricken by a court," not division of the agreement into multiple agreements. *Id.* The same is true here. *See* Baker Decl. Ex. D (SPA) § 11.7. Thus, *Samba* does not support a finding of divisibility in this case.

---

[15]    When the SPA referred to a separate agreement—like the Confidentiality Agreement—it knew how to do so. *See, e.g.*, Baker Decl. Ex. D (SPA) § 11.3 ("This Agreement (including the Schedules hereto) and the Confidentiality Agreement constitute the entire agreement … between the Parties ….").

### 2. Tyson Has Not Identified Any Continued Performance By Defendants That Would Prevent Defendants From Excusing Performance As To The Korean Business

Tyson's assertion (Letter 3, ECF No. 33) that its material breaches do not excuse Beef Holdings' performance because Beef Holdings did not subsequently terminate the SPA is wrong. "When a party materially breaches a contract, the non-breaching party must choose between two remedies—he can elect to terminate the contract and recover liquidated damages or he can continue the contract and recover damages solely for the breach." *Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1012 (S.D.N.Y. 1995). The time to make an election "comes when the party making the election must render some performance under the terms of the contract." *Lucente v. IBM*, 310 F.3d 243, 259 (2d Cir. 2002). Here, Tyson argues that Beef Holdings elected not to terminate the SPA when it "exchang[ed] letters with Tyson and negotiat[ed] to resolve the parties' disputes." Letter 3. But corresponding and negotiating with Tyson over its breaches is not continued performance under the SPA. And, in any event, Tyson's material breach was not fully matured until Tyson refused to reverse its improper Purchase-Price adjustment during the parties' post–Objection Notice "good faith" negotiations. *See* Baker Decl. Ex. D (SPA) § 2.4.3. Instead, the time for Beef Holdings to perform came when Tyson purported to exercise its conditional right to sell the Korean Business back to Beef Holdings. Given Tyson's prior material breaches, Defendants were excused from this performance.[16]

---

[16]   Tyson's assertion that Beef Holdings' allegation in the First-Filed Action that the SPA is a valid contract somehow "bound" Beef Holdings to the SPA after Tyson's material breaches is erroneous. This allegation says nothing about Beef Holdings' continued performance. Indeed, Beef Holdings explicitly requests a declaration from the Court that "Beef Holdings is excused from further performance under the SPA, including payment of any Purchase Price adjustment under Section 2.4.6 of the SPA, due to Tyson's material breaches." First-Filed Action Compl. ¶ 219(e).

## **CONCLUSION**

For the foregoing reasons, Tyson's motion for summary judgment should be denied.

DATED:   New York, New York          QUINN EMANUEL URQUHART
         February 5, 2020              & SULLIVAN, LLP

By: _____
    Michael B. Carlinsky
    Blair A. Adams
    Evan Hess
    Jaclyn Palmerson

    51 Madison Avenue, 22nd Floor
    New York, New York  10010-1601
    (212) 849-7000

    *Attorneys for Defendants*